[Cite as *In re R.K.*, 2020-Ohio-35.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE R.K.

A Minor Child

No. 108568

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 9, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. PO19303000

---

### *Appearances:*

Zukerman Lear & Murray, Co., L.P.A., Brian A. Murray and Larry W. Zukerman, *for respondent-appellant.*

Carolyn Kaye Ranke and Nancy T. Jamieson, *for petitioners-appellees.*

FRANK D. CELEBREZZE, JR., J.:

{¶ 1} Respondent-appellant, R.K. ("appellant"), brings the instant appeal challenging the trial court's judgment granting a juvenile civil protection order ("JCPO") filed by petitioners-appellees. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} The instant matter arose from an ongoing, two-year dispute between neighbors. Appellant and his family have lived next door to petitioners-appellees (collectively "petitioners") for approximately ten years. At some point, a dispute arose regarding which family owned the tree lawn near the end of petitioners' driveway. The police had been contacted on multiple occasions regarding the dispute. At some point in 2018, the tree lawn dispute ended.

{¶ 3} The petitioners' family consists of D.W., mother, L.W., father, and two daughters, Sa.W. and St.W. Appellant and Sa.W. are in the same grade and attend the same school. This appeal primarily focuses on several incidents that have occurred between appellant and Sa.W. after the tree lawn dispute subsided.

{¶ 4} D.W. alleged that appellant was engaging in conduct in order to deliberately annoy Sa.W. and cause her and the family mental distress. Several incidents purportedly occurred between March 2018 and March 2019. D.W. alleged that appellant committed the offense of menacing and caused the family mental distress by (1) whistling at Sa.W., (2) building a snow and ice barrier in February 2018 that prevented the family from entering their driveway, (3) building a "graphic" snowman that had a penis and testicles in March 2018, (4) posting a photo and video on Instagram[1] in February 2019 in which appellant alleged that Sa.W. was stalking him, and (5) blocking Sa.W.'s path on the sidewalk to the school bus in

---

[1] Instagram is a popular social-media site. *See, e.g., State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 5.

February 2019.  The specific details of these incidents will be set forth in further detail below.

{¶ 5} On March 14, 2019, D.W. filed a petition for a protection order, pursuant to R.C. 2151.34, against appellant.  D.W. sought protection for herself, her husband L.W., her 11-year old daughter Sa.W., and her 9-year old daughter St.W. In her petition, D.W. alleged, in relevant part,

7. Most recently on [February 18, 2019,] in the evening [appellant] posted a photo of [Sa.W.] in her bathroom closing the blinds.  The next morning, [appellant and his step brother] stood in the path of [Sa.W.] physically blocking her access to the bus stop.  That afternoon, [appellant] posted a video online stating (1) He threw a stick at [Sa.W.], (2) Whistled inappropriate[e]ly at her in school, in public, and on the bus (3) and put a snowman in her driveway blocking her access to her driveway.

* * *

On [March 2, 2018,] [appellant] built a snowman with a penis [and] testicles on the [petitioners'] property facing [Sa.W.'s] bedroom.  The snowman appeared to have urine [and] blue liquid on it.

[Appellant and] his family were warned to stop this behavior by the police or they could face criminal menacing charges.

Shaker schools have determined that the incidents from [February 19 through February 20, 2019] are cyber bullying.

Shaker school has also documented [appellant] inapprop[riately] whistling beginning in 2011.

Shaker police have multiple reports dating back to 2011.

[Appellant] may be encouraged by his family to continue abusing [Sa.W. and] her family/property due to Father's action: theft of [petitioners'] property, [h]arassment to [D.W. and L.W.]

8. [Appellant's] actions have caused [Sa.W. and] our family mental distress.  [Sa.W.] is anxious [and] afraid because of (1) Online posts

[and] videos, (2) physical actions by [appellant and] friends/family make her feel that she is immediate danger. She is afraid, sad, embarrassed [because] of [appellant's] conduct. She feels this way at school [and] at home since [appellant] lives next door. She worries that [appellant] may physically hurt her, her family, her friends, her property [and] her dog.

[Sa.W.] is very worried that [appellant and] his family will retaliate with their words [and] physical actions * * * [b]ecause of the repeated pattern of conduct by [appellant and] his family/friends.

{¶ 6} A magistrate granted an ex parte JCPO on March 14, 2019, designating D.W., L.W., and both daughters as protected parties. A magistrate held a full hearing on the petition on March 22, 2019. During the hearing, D.W., Sa.W., appellant, and appellant's father testified.

{¶ 7} On March 26, 2019, the magistrate granted D.W.'s petition for a JCPO. The magistrate ordered the protection order to remain in effect until June 6, 2027, at which point appellant would reach the age of 19. On March 27, 2019, the trial court adopted the magistrate's decision.

{¶ 8} Appellant filed objections to the trial court's judgment adopting the magistrate's decision on April 9, 2019. On May 1, 2019, the trial court issued a judgment entry overruling appellant's objections and adopting the magistrate's decision.

{¶ 9} Appellant filed the instant appeal on May 13, 2019, challenging (1) the magistrate's March 26, 2019 judgment entry granting the protection order, and (2) the trial court's May 1, 2019 judgment overruling his objections to the magistrate's decision. Appellant assigns six errors for review:

I. The petitioner failed to offer sufficient evidence to support the issuance of a juvenile civil protection order against the respondent.

II. The juvenile court's judgment was against the manifest weight of the evidence because the petitioner never established that the respondent committed any of the enumerated offenses set forth in R.C. 2151.34(C)(2).

III. The juvenile court's judgment was against the manifest weight of the evidence because there was no evidence, let alone competent, credible evidence that the petitioner and/or any of her family members were in danger of future harm by the respondent.

IV. The juvenile court's judgment was against the manifest weight of the evidence because the court never found that the respondent committed any of the enumerated offenses set forth in R.C. 2151.34(C)(2) and/or all the elements of such an offense.

V. The juvenile court abused its discretion in including the petitioner, the petitioner's husband, and her youngest daughter on the protection order.

VI. The juvenile court abused its discretion in ordering that the terms of the protection order it issued against the respondent shall be effective for more than eight years, until June 6, 2027.

{¶ 10} To the extent that appellant's assignments of error and the arguments raised therein are interrelated, they will be addressed together.

## II. Law and Analysis

### A. Standard of Review

{¶ 11} R.C. 2151.34 authorizes juvenile courts to issue and enforce protection orders against juvenile respondents, regardless of the familial relationship between the parties. The statute became effective on June 17, 2010, after the General Assembly passed Am.Sub.H.B. 10. *See In re E.P.*, 8th Dist. Cuyahoga No. 96602, 2011-Ohio-5829, ¶ 6.

{¶ 12} In order to obtain a JCPO under R.C. 2151.34(C)(2), the petitioner must allege in the petition that the respondent violated one of the offenses enumerated in the statute. Specifically, R.C. 2151.34(C) provides, in relevant part,

> (2) The petition shall contain or state all of the following:
>
> (a) An allegation that the respondent engaged in a violation of section 2903.11 [felonious assault], 2903.12 [aggravated assault], 2903.13 [assault], 2903.21 [aggravated menacing], 2903.211 [menacing by stalking], 2903.22 [menacing], or 2911.211 [aggravated trespass] of the Revised Code, committed a sexually oriented offense, or engaged in a violation of any municipal ordinance that is substantially equivalent to any of those offenses against the person to be protected by the protection order, including a description of the nature and extent of the violation;
>
> * * *
>
> (c) A request for relief under this section.

{¶ 13} In *In re E.P.*, this court set forth the applicable standard of review for a trial court's decision with respect to a protection order:

> whether the protection order should have been issued at all (i.e., whether the petitioner met his or her burden by a preponderance of the evidence) is essentially a manifest weight of the evidence review. *Rauser v. Ghaster*, 8th Dist. [Cuyahoga] No. 92699, 2009[-]Ohio[-]5698, ¶ 12, citing *Caban v. Ransome*, 7th Dist. [Mahoning] No. 08MA36, 2009[-]Ohio[-]1034, ¶ 7. Judgments supported by competent, credible evidence going to all the essential elements of the claim will not be reversed on appeal as being against the manifest weight of the evidence. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007[-]Ohio[-]4918, 874 N.E.2d 1198, ¶ 3. *See also Young v. Young*, 2d Dist. [Greene] No. 2005-CA-19, 2006[-]Ohio[-]978, ¶ 22 (When an appellant challenges whether the protection order should have been issued at all, the standard of review is whether the trial "court's decision was supported by sufficient competent, credible evidence.").

*In re E.P.* at ¶ 18.

{¶ 14} As an initial matter, the record reflects that petitioners properly petitioned the court, in compliance with R.C. 2151.34. In the petition, petitioners alleged that appellant committed the offense of "criminal menacing."

{¶ 15} The record also reflects that the magistrate complied with the requirements set forth in R.C. 2151.34(D). After granting the ex parte protection order on March 14, 2019, the magistrate held a full hearing on the petition on March 22, 2019. Following the hearing, the magistrate determined, by a preponderance of the evidence, that appellant engaged in menacing by stalking, in violation of R.C. 2903.211. (Tr. 135.)

{¶ 16} Furthermore, before turning to the merits of this appeal, we will address appellant's legislative intent argument regarding the juvenile civil protection order statute. Specifically, appellant argues that R.C. 2151.34 was enacted in response to the Shynerra Grant and Johanna Orozco tragedies and in order to prevent teenage dating violence, not to encourage every juvenile that has a fight or an issue with a classmate to run to the courthouse and file a petition.

> Shynerra Grant was a 17-year-old high school graduate from Toledo who was headed to college on a scholarship. She was shot and killed by her ex-boyfriend in 2005. For more than a year before this tragic shooting, her ex-boyfriend stalked and abused her, including an incident in 2004 when he broke into her home and broke her jaw. Shynerra had tried to obtain a protection order against her ex-boyfriend, but was turned away from the courts.

> Johanna Orozco, was shot in the face by her ex-boyfriend in 2007 — days after he was released from juvenile prison for raping her. Orozco lived, but has disfiguring injuries. During their relationship, her ex-boyfriend had repeatedly hit, pushed, and kicked her. Orozco had also tried to obtain a protection order against her ex-boyfriend, but was

unable to get one due to the law regarding protection orders at that time.

*In re E.P.*, 8th Dist. Cuyahoga No. 96602, 2011-Ohio-5829, at ¶ 7-8.

{¶ 17} In support of his legislative intent argument, appellant directs this court's attention to *In re E.P. In re E.P.* involved two sixth graders that got into a fight on the school bus during which the petitioner sustained a broken nose. Although the boys offered conflicting accounts of the fight, this court recognized that the record was devoid of any evidence that petitioner was in danger of future harm by respondent:

> The two boys had never been in a fight with each other before this incident. There was no evidence that E.P., who had never before gotten into a fight with anyone or had any disciplinary issues, had ever threatened A.G. with harm — before or after the bus incident. Nor was there any evidence that E.P. had engaged in any pattern of conduct that would amount to harassing A.G. or bullying him — physically or mentally. And notably, A.G. testified that he was not afraid of E.P.

*Id.* at ¶ 44. Regarding the legislature's intent in enacting R.C. 2151.34, this court explained, "[t]his court does not believe that the legislature intended for every child who gets into a fight at school to be able to obtain a juvenile civil protection order. The potential ramifications of such a holding would be far reaching. This could not have been what the legislature intended when it passed H.B. 10." *Id.* at ¶ 45.

{¶ 18} After reviewing the record, we find this case to be factually distinguishable from *In re E.P.* As set forth in further detail below, the record reflects that the petition in this case was not filed based on a single, isolated incident between appellant and Sa.W. Rather, this case involves a pattern of conduct that occurred over at least a two-year time period. Furthermore, unlike *In re E.P.*, the

record before this court contains competent and credible evidence that appellant's conduct caused Sa.W. mental distress and that she was in danger of future mental distress.

{¶ 19} We also find appellant's legislative intent argument to be misplaced. Although the Grant and Orozco tragedies may have been the impetus for the enactment of R.C. 2151.34, it does not mean that a juvenile protection order can *only* be issued in these types of violent and physically abusive situations. Had this been the intent of the legislature, it is unlikely that menacing by stalking would have been included as an enumerated offense in R.C. 2151.34(C)(2)(a) because the offense of menacing by stalking does not necessarily require actual physical violence.

## B. Issuance of Protection Order

{¶ 20} Appellant's first, second, third, and fourth assignments of error are related because they all pertain to the trial court's judgment granting the protection order. Appellant essentially raises a sufficiency and manifest weight challenge to the trial court's judgment. For ease of discussion, we will address appellant's assignments of error together, and out of order.

{¶ 21} In his fourth assignment of error, appellant argues that the trial court did not conclude that he committed any of the enumerated offenses under R.C. 2151.34(C)(2) or determine that the elements of an enumerated offense were established by petitioners.

{¶ 22} Initially, we note that the magistrate did not specifically find that appellant committed any of the enumerated offenses under R.C. 2151.34(C)(2) in its

March 26, 2019 judgment entry. However, after hearing the testimony at the March 22, 2019 hearing, the magistrate concluded that petitioners established, by a preponderance of the evidence, the elements of menacing by stalking, in violation of R.C. 2903.211. The magistrate concluded, in relevant part,

> I find that specifically with regard to menacing by stalking, which specifically states that no person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.
>
> I find specifically with respect to menacing by stalking, the elements of that statute have been met.

(Tr. 134-135.)[2]

{¶ 23} Accordingly, the magistrate specifically concluded that petitioners met their burden of proving, by a preponderance of the evidence, that appellant committed the enumerated offense of menacing by stalking. Therefore, appellant's fourth assignment of error is overruled.

{¶ 24} In his first assignment of error, appellant argues that petitioners presented insufficient evidence to support the issuance of the protection order against appellant. In his second assignment of error, appellant argues that petitioners failed to establish that he committed any of the enumerated offenses set forth in R.C. 2151.34(C)(2). In his third assignment of error, appellant argues that

---

[2] In addition to the offense of menacing by stalking, the magistrate also appeared to conclude, by a preponderance of the evidence, that appellant engaged in the sexually oriented offenses of voyeurism and "displaying matter harmful to a juvenile." (Tr. 135.)

there was no competent and credible evidence in the record that petitioners were in danger of future harm by appellant.

{¶ 25} As noted above, the magistrate concluded that petitioners demonstrated, by a preponderance of the evidence, that appellant committed the offense of menacing by stalking. In its March 26, 2019 judgment entry, the magistrate made factual findings based on the testimony presented during the March 22, 2019 hearing on the petition. The magistrate concluded that "the Protected Persons are in immediate and present danger from [appellant]."

{¶ 26} In this appeal, this court must determine if there was competent, credible evidence that Sa.W. was in danger of future harm, including mental distress, from appellant. After reviewing the record, we find that the trial court's finding that Sa.W. is "in immediate and present danger" of future harm, including mental distress, by appellant, such that Sa.W. is entitled to an order protecting her from further harm, is supported by competent and credible evidence.

### 1. Menacing By Stalking

{¶ 27} R.C. 2903.211 provides, in relevant part:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person.

* * *

(D) As used in this section:

(1) "Pattern of conduct" means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents.

(2) "Mental distress" means any of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

{¶ 28} After reviewing the record, we find that petitioners presented sufficient evidence upon which the magistrate could conclude that appellant's actions caused Sa.W. mental distress.

{¶ 29} With respect to the "pattern of conduct" element, the evidence presented by petitioners demonstrated that the first incident between appellant and Sa.W. occurred at least three years before the March 22, 2019 hearing.[3] Appellant would constantly whistle at Sa.W. at the bus stop and at school while she was in class. Sa.W. asserted that appellant would whistle at or flirt with her in class which affected her ability to focus on tests. Appellant's whistling made her feel "annoyed and fearful."

{¶ 30} D.W. testified that appellant's whistling made Sa.W. feel annoyed, threatened, and abused. (Tr. 30.) Although Sa.W. was a straight-A student, she performed poorly on some tests.

{¶ 31} Although Sa.W. opined that the whistling started when they were in the third grade, appellant's whistling was not reported to the school until March

---

[3] During oral arguments, appellant's counsel opined that the whistling occurred when appellant and Sa.W. were in the third grade and approximately eight years old.

2018. The school conducted an investigation for "[h]arassment, [bullying]." Appellant and Sa.W. were also placed in separate classes, and appellant was warned by the school to cease whistling at Sa.W. "throughout all school settings," including at the bus stop, and to cease communication with Sa.W. "in word and action." Appellant testified at the hearing that he meant to bother Sa.W. by whistling at her. (Tr. 97.) The report from the school's investigation indicated that appellant acknowledged that he whistled at Sa.W. to annoy her.

{¶ 32} A second incident between appellant and Sa.W.'s family occurred in February 2018. When petitioners returned from an out-of-town ski trip, they were unable to pull into their driveway because there was a "huge ball of snow and ice" and a snowman preventing them from doing so. Petitioners alleged that there was a path from their driveway to appellant's yard. Based on this observation, petitioners opined that appellant or someone from his family created the barrier. This incident was reported to the Shaker Heights Police Department. Appellant testified that his friends built the barrier in petitioners' driveway and that he had no involvement in this incident.

{¶ 33} A third incident between appellant and Sa.W.'s family occurred in March 2018. Appellant built a snowman displaying "male genitalia" on the edge of his family's property. (Tr. 12.) This snowman faced the petitioners' house, and according to D.W., "specifically [Sa.W.'s] window." (Tr. 36.) This incident was reported to the Shaker Heights Police Department. Officers came to petitioners' house and attempted to speak with appellant's family. Officers followed up with

appellant's family, and issued a warning that menacing charges could be filed if this behavior continued.  Appellant testified at the hearing that he built the snowman with his step-brother because they thought it was funny.

{¶ 34} A fourth incident between appellant and Sa.W. occurred on February 19, 2019.  Appellant posted a photo of Sa.W. in her bathroom on his Instagram account.  The photo was captioned, "[Sa.W.], my neighbor, is stalking me."  (Tr. 12.)

{¶ 35} Sa.W. testified about this photo during the hearing,

> I was in the bathroom.  I went to use the rest room and I noticed the blinds were open, so I closed the blinds and [appellant] took a picture of me, but I didn't see him take a picture of me.  So then my friend, she texted me a picture, a screenshot of the night of that incident because it was on Instagram, so I didn't know what to do so I [posted] that wasn't me.  Then I think [appellant] commented back on my post that that was [her], so I was embarrassed.

(Tr. 79.)  Sa.W. posted on Instagram that it was not her in the photo because "I was scared.  I didn't know what to do."  (Tr. 80.)  Sa.W.'s classmates and friends saw appellant's post.  Appellant's post made Sa.W. feel scared and embarrassed, and she was embarrassed that appellant called her a stalker.

{¶ 36} Appellant testified at the hearing about the photo: "I just saw her with her hands up against the window, so I decided to take a picture."  (Tr. 98.)  He explained that he took the photo because he felt "uncomfortable."  He saw Sa.W. looking out the bathroom window when he left his room to walk downstairs; at that point, he let it go.  When he went back upstairs, he saw that she was still looking out the window, so he took a picture of her.  After he posted the Instagram photo, he

told his father about the incident. He did not like how Sa.W. was looking into his house.

{¶ 37} In other words, petitioners' theory was that appellant posted the Instagram photo to harass and embarrass Sa.W. On the other hand, appellant's theory was that he posted the photo as a cry for help and based on his belief that Sa.W. and her family members were targeting him. The trial court's judgment granting the protection order is not against the manifest weight of the evidence simply because the court found petitioners' theory and the testimony of Sa.W. and D.W. to be more credible than appellant's theory and the testimony of appellant and his father.

> The Ohio Supreme Court has explained that when reviewing challenges to the manifest weight of the evidence, a court of appeals must be guided by the presumption that the findings of the trier of fact were indeed correct. *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 79-80, 461 N.E.2d 1273 [(1984)]. The underlying rationale for giving deference to the trial court's findings "rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.*

*In re E.P.*, 8th Dist. Cuyahoga No. 96602, 2011-Ohio-5829, at ¶ 62 (Cooney, J., dissenting.)

{¶ 38} A fifth incident occurred between appellant and Sa.W. the next morning, on February 20, 2019. As Sa.W. was attempting to walk onto the school bus, appellant and his step-brother stood in her path and attempted to block her path from the sidewalk onto the bus. Sa.W. explained that appellant and his step-brother "started walking slower so I couldn't get to the bus stop on time, so I had to

go around them, but like it was frustrating to me that they did that to me[.]" (Tr. 85.) The petition alleged that appellant "stood in the path of [Sa.W.] physically blocking her access to the bus stop."

{¶ 39} A sixth incident occurred between appellant and Sa.W. later that same day. Appellant posted a video on his Instagram account in which he described some of the incidents that transpired between him and Sa.W. He asserted that he threw sticks into Sa.W.'s yard, whistled at her, and blocked their driveway with snow. Appellant also asserted that petitioners repeatedly called the police on him and alleged that they were trying to put him in "juvie." Appellant alleged that Sa.W. and her family were bullying him.

{¶ 40} Sa.W. testified that appellant's video made her scared of what was going to happen. The Instagram video made her feel scared, embarrassed, fearful, and sad. (Tr. 82.) The video made her feel "scared, fearful, embarrassed, because I didn't know what was going to happen." (Tr. 89.)

{¶ 41} Appellant testified that he posted the video "because I just felt like I was being targeted by [Sa.W.'s family] and I just felt mad." (Tr. 95.) He opined that the family had been targeting or picking on him for approximately one year. (Tr. 95.) He confirmed that he posted the video "to expose how [he] felt like a victim[.]" (Tr. 108.)

{¶ 42} Finally, a seventh incident occurred between appellant and Sa.W. involving appellant throwing sticks into petitioners' yard. Sa.W. testified at the hearing that appellant threw a stick or sticks into her family's yard. She explained

that appellant did not throw the stick at her, but she was on the lawn when he threw the stick. She "had to run" away from appellant. (Tr. 90.)

{¶ 43} Appellant acknowledged that he threw sticks into petitioners' back yard because the family had called the police on his family so many times and he also thought it was funny. (Tr. 100.)

{¶ 44} The aforementioned testimony demonstrates the existence of a pattern of abusive and harassing conduct, starting with the whistling incidents as early as 2015, the snow and ice barrier in February 2018, and the social media posts and bus stop interference in February 2019. Based on the evidence presented about these incidents, we find that the trial court's determination that petitioners established a pattern of conduct is supported by competent and credible evidence in the record.

## 2. Knowingly Causing Mental Distress and Danger of Future Harm

{¶ 45} Appellant argues that there was insufficient evidence that he "knowingly" caused Sa.W. and her family to believe he would cause physical harm or mental distress. We disagree.

{¶ 46} Initially, to the extent that appellant argues that petitioners failed to demonstrate that he "knowingly" caused petitioners to believe appellant would cause them physical harm or mental distress, this argument is unsupported by the record.

{¶ 47} In *In re J.H.*, 10th Dist. Franklin No. 13AP-70, 2013-Ohio-3833, the respondent-appellant argued that (1) the petitioner-appellee failed to demonstrate

that appellant "knowingly" caused petitioner to believe appellant would cause her physical harm or mental distress, and (2) there was no evidence respondent tried to hurt or scare petitioner. The Tenth District acknowledged that there was no evidence that appellant actually carried out her threats of physical violence against appellee. However, the appellate court concluded that the trial court had sufficient evidence to conclude that appellant knowingly caused appellee to believe she would cause her physical harm or mental distress: "[a]ppellant's repeated tweets and text messages threatening to beat appellee up can be characterized as nothing less than knowing attempts to cause appellee to believe appellant would cause her physical harm." *Id.* at ¶ 19.

{¶ 48} In the instant matter, appellant's repeated acts of harassing Sa.W. can be characterized as nothing less than knowing attempts to cause her to believe that appellant would cause her physical harm or mental distress. Appellant specifically acknowledged during the hearing that he intended to "annoy" and "bother" Sa.W. and her family members.

{¶ 49} Furthermore, to the extent that appellant argues that petitioners failed to demonstrate that Sa.W. or her family members suffered physical harm or mental distress as a result of his actions, this argument is also unsupported by the record.

{¶ 50} In the petition, petitioners alleged that appellant's actions have caused mental distress. Specifically, petitioners alleged that Sa.W. is "anxious and afraid" because of the incidents involving appellant; she feels she is in immediate

danger; and that she is "afraid, sad, [and] embarrassed" because of appellant's conduct. Sa.W. "worries that [appellant] may physically hurt her, her family, her friends, her property, [and] her dog."

{¶ 51} The evidence presented at the hearing demonstrated that the aforementioned incidents between appellant and Sa.W. caused mental distress to Sa.W. Sa.W. testified that appellant is "someone that scares me and sometimes I'm scared to go to school because of what he said to my family in the past." (Tr. 77.) She has been scared of appellant for "a long time." After appellant posted the photo and video on Instagram, Sa.W. began seeing a doctor. She explained that the "main reason" that she sought medical intervention was appellant's conduct. (Tr. 86.) Sa.W. feels distressed when she thinks about appellant and when she sees him. She is scared that something will happen to her dog, her family, and her friends. A protection order will make Sa.W. feel safer.

{¶ 52} D.W. testified at the hearing that Sa.W. initially sought therapy from the school counselor. Sa.W. worked with the school counselor for approximately two weeks after the February 2019 Instagram posts. Sa.W. followed up with a private psychologist in March 2019.

{¶ 53} Appellant testified during the hearing that he did not consider the aforementioned incidents between him and Sa.W. to be "scary," nor did he intend to scare or "inspire fear" in Sa.W. or her family members. Appellant explained that he does not want Sa.W. or any of her family members to feel scared of him and he does not intend to stress them out. (Tr. 96.) Appellant confirmed that he never

intended to make Sa.W. or her family members sad or scared of him, and that he "only tried to make them annoyed." (Tr. 99.)

{¶ 54} Appellant testified that he was not thinking about how his conduct could effect Sa.W. or her family before the incidents. He explained that in looking back, "now I see how [Sa.W. and her family] could be scared." (Tr. 103.) He understands how they could be annoyed by his behavior.

{¶ 55} Regarding the whistling incidents, appellant testified that he intended to bother Sa.W. by whistling at her, but he did not intend to scare her. Appellant did not know that Sa.W. had a hearing sensitivity, and he only learned about this during her hearing testimony.

{¶ 56} Regarding the Instagram posts, appellant confirmed that he would be embarrassed if Sa.W. posted similar photos and videos of him on social media or alleged that he was a stalker. (Tr. 103.) After meeting with the school about the Instagram posts, appellant removed them from his account.

{¶ 57} The record reflects that Sa.W.'s fear of appellant, which began "a long time" ago, had not subsided at the time of the hearing. Based on the incidents that occurred between appellant and Sa.W., her fear only intensified.

{¶ 58} D.W. testified that as a result of the incidents, particularly the Instagram posts, Sa.W. had been working with the school counselor and a private psychologist to alleviate her anxiety, sadness, embarrassment, and fear resulting from the incidents involving appellant.

{¶ 59} Based on the evidence presented about the mental distress that Sa.W. suffered as a result of appellant's actions, we find that the trial court's determination that appellant was aware that his actions would probably cause a specific result — specifically, causing Sa.W. to believe he would physically harm her or cause her mental distress — is supported by competent and credible evidence in the record.

{¶ 60} Petitioners also presented evidence about the mental distress that D.W. and the family suffered as a result of appellant's actions.  D.W. also testified about the effect that appellant's actions have had on her.  She explained that appellant's behavior "makes me feel terrible that my daughter has to walk to the school bus every day in fear of what's going to happen either verbally or physically at this point.  I'm afraid it's going to escalate to [a physical altercation].  I'm deathly afraid of that."  (Tr. 46.)  On cross-examination, D.W. confirmed that she is fearful for Sa.W.'s safety and her mental health.

{¶ 61} D.W. described the snow and ice barrier that her family encountered upon returning home from an out-of-town trip in February 2018 as "intimidating." She testified that the vulgar snowman that appellant built in March 2018 "mentally distressed me and my family."  (Tr. 59.)  D.W. opined that appellant's whistling was "intimidating" and that appellant whistled at Sa.W. to harass her.  D.W. testified that the whistling "create[d] emotional distress for [Sa.W.]" and her family.  (Tr. 60.) D.W. explained that she heard appellant whistling at Sa.W. at the bus stop and that she "felt threatened for [Sa.W.] because I know that it bothers her."  (Tr. 61.)

**{¶ 62}** D.W. found the vulgar snowman to be "offensive" and it made her feel threatened based on "the totality of all of these issues." (Tr. 64.)

**{¶ 63}** D.W. testified that appellant's conduct had resulted in emotional harm rather than actual physical harm or threats of physical harm. She confirmed that she is "fearful of what's to come" with appellant. (Tr. 71.) D.W. explained that she is scared that appellant may escalate from causing emotional harm to physical harm:

> [t]he leap happens when something goes from being as benign as whistling to then physically putting blockades [in the driveway], then physically blocking [Sa.W.] with [his] body [at the bus stop], putting things online.
>
> It's just an escalation and I'm concerned about what the next step will be.

(Tr. 72-73.)

**{¶ 64}** Finally, D.W. testified about the effect appellant's actions have had on her and her family: "[w]e are mentally harassed. There is mental distress caused by this between myself, my daughter [Sa.W.], my other daughter [St.W.], and my husband [L.W.]" (Tr. 73.)

**{¶ 65}** After reviewing the record, we find that the trial court heard sufficient testimony to conclude that Sa.W. was, in fact, in fear that appellant would commit future offenses against her and her family. The trial court's determination that Sa.W. is "in immediate and present danger from [appellant]" is supported by competent and credible evidence in the record.

{¶ 66} Sa.W. testified that she feared that appellant would commit future offenses against her, and that the JCPO would make her feel safer. Based on the testimony presented at the hearing, it is evident that Sa.W. feared appellant would continue to commit the same or similar acts against her and her family.

{¶ 67} Furthermore, there is no indication in the record that appellant was or would be deterred by authority figures. *See In re J.H.*, 10th Dist. Franklin No. 13AP-70, 2013-Ohio-3833, at ¶ 15 (appellant-respondent failed to heed to multiple warnings from the school to stop making threats to the petitioner-appellee). Appellant continued to bother Sa.W. after (1) he was warned by the school to stop whistling at her in March 2018, and (2) he was warned by the Shaker Heights Police Department that he could face menacing charges if he continued to bother Sa.W. and her family after building the graphic snowman in March 2018. Appellant's continued menacing behavior in the face of multiple warnings demonstrates his incorrigibility and the need for a JCPO going forward — particularly because he lives next door to Sa.W. and is in the same grade as her at the same school. Accordingly, we find that the trial court had sufficient evidence to believe that Sa.W. feared appellant would continue to commit the same or similar acts in the future.

{¶ 68} For all of the foregoing reasons, we find that the trial court's judgment granting the protection order was not against the manifest weight of the evidence. The record reflects that petitioners established, by a preponderance of the evidence, that appellant committed the offense of menacing by stalking. The trial court's determination that Sa.W. is "in immediate and present danger" of future harm,

including mental distress, by appellant is supported by competent and credible evidence in the record. Accordingly, appellant's first, second, and third assignments of error are overruled.

## C. Scope of Protection Order

{¶ 69} Appellant's fifth and sixth assignments of error pertain to the scope of the protection order issued by the trial court. As noted above, when an appellant challenges whether the protection order should have been issued at all, this court determines whether the trial court's decision is supported by competent, credible evidence in the record. *In re E.P.*, 8th Dist. Cuyahoga No. 96602, 2011-Ohio-5829, at ¶ 18. On the other hand, challenges to the scope of a protection order are reviewed for an abuse of discretion. *L.T.C. v. G.A.C.*, 8th Dist. Cuyahoga No. 107110, 2019-Ohio-789, ¶ 37, citing *Allan v. Allan*, 8th Dist. Cuyahoga No. 101212, 2014-Ohio-5039, ¶ 13.

### 1. Protected Persons

{¶ 70} In his fifth assignment of error, appellant argues that the trial court abused its discretion in including D.W., L.W., and St.W. as protected persons.

{¶ 71} D.W. is listed as the "petitioner" that was filed on March 14, 2019 petition. The petition indicates that D.W. sought relief (1) on her own behalf, and (2) on behalf of her family and household members, Sa.W., St.W., and L.W.

{¶ 72} The allegations in the petition primarily focused on Sa.W. However, the petition also referenced the mental distress appellant has caused to the family.

**{¶ 73}** As noted above, D.W. and Sa.W. testified at the full hearing on the petition. Neither L.W. nor St.W. testified. The record reflects that the magistrate heard testimony about incidents that specifically targeted Sa.W. — the whistling and bus stop interference incidents and the Instagram posts — and incidents that targeted the entire family — the snow and ice barrier incident in February 2018 and the vulgar snowman incident in March 2018.

**{¶ 74}** Pursuant to R.C. 2151.34(C)(1), D.W. was permitted to seek relief on behalf of herself and on behalf of any other family or household member. "R.C. 3113.31(A)(3) defines 'family or household member' as a spouse or child 'who is residing with or has resided with the [petitioner.]'" *M.J.W. v. T.S.*, 8th Dist. Cuyahoga No. 108014, 2019-Ohio-3573, ¶ 28, quoting R.C. 3113.31(A)(3).

**{¶ 75}** D.W. and Sa.W. had to prove that L.W. and St.W. resided or currently was residing with D.W. and Sa.W. D.W. testified that she lives with her husband, L.W., and her two daughters, Sa.W. and St.W. Sa.W. testified that she lives with her mother (D.W.), father (L.W.), and sister (St.W.).

**{¶ 76}** Finally,

> "'[a] court must take everything into consideration when determining if a respondent's conduct constitutes a pattern of conduct, even if some of the person's actions may not, in isolation, seem particularly threatening.'" *Guthrie v. Long*, 10th Dist. Franklin No. 04AP-913, 2005-Ohio-1541, ¶ 12, quoting *Miller v. Francisco*, 11th Dist. Lake No. 2002-L-097, 2003-Ohio-1978.

*M.J.W.* at ¶ 30.

{¶ 77} In the instant matter, even if the snow and ice barrier or vulgar snowman incidents may not, in isolation seem particularly threatening, the trial court was required to take everything into consideration when determining whether to include D.W., L.W., and St.W. as protected persons. The trial court also heard testimony that the dispute between the two families began shortly after the petitioners moved into the house next door to appellant's family, and that the dispute was ongoing at the time of the March 2019 hearing.

{¶ 78} For all of these reasons, we find no basis upon which to conclude that the trial court's decision to include D.W., L.W., and St.W. as protected parties was unreasonable, arbitrary, or unconscionable. The fact that the families live next door to each other supports the trial court's decision to include them as protected parties because there is likely to be the potential for more interactions between appellant and Sa.W.'s family members than between a petitioner and respondent that do not live next door to one another.

{¶ 79} The record reflects that the trial court carefully considered the totality of the circumstances and all of the relevant factors, including the close proximity of petitioners' and appellant's family, in crafting the scope of the protection order. Regarding the scope of the protection order, the magistrate stated,

> obviously, you two live next door to one another, so I'm not going to prevent you of course from living in your own homes, but you [appellant] are not to go on the property of the other person [petitioners].

> You have to stay away from one another.

> [Appellant], you cannot block the sidewalk. You shouldn't do that to any person whether it's meant as a joke, not a joke. You cannot block the sidewalk of [Sa.W.] leaving her house, going to the bus stop.

(Tr. 137.)

{¶ 80} The trial court crafted the scope of the protection order in a way that would sufficiently protect Sa.W. and her family without unnecessarily burdening appellant and his family. For instance, based on the fact that the families live next door to one another, the trial court excluded the protection order from applying to the bus stop and school bus. The trial court also did not impose any conditions that would significantly disrupt the education of either appellant or Sa.W. The magistrate explained,

> [appellant is] allowed to go on the bus. There's going to be a condition of the protection order which says that you're allowed to be in school together. School is to keep you as separate as possible.

> I'm not going to put in the additional provision that the school needs to do it in every possible circumstance. If there's a fire drill, it there's an assembly or something like that, but [appellant], you're a smart kid. If you are walking out to the bus, if you see her walking, wait and let her walk on the bus.

(Tr. 140.)

{¶ 81} Accordingly, the record reflects that the trial court carefully considered the totality of the circumstances in crafting the scope of the protection order. We find no basis upon which to conclude that the trial court's decision regarding the scope of the protection order — including the decision to include D.W., L.W., and St.W. as protected persons — was unreasonable, arbitrary, or unconscionable.

{¶ 82} Appellant's fifth assignment of error is overruled.

## 2. Duration

{¶ 83} In his sixth assignment of error, appellant argues that the trial court abused its discretion in ordering the protection order to remain in effect for more than eight years, until June 6, 2027, at which point appellant will be 19 years old.

{¶ 84} Regarding the duration of the protection order, the magistrate stated, in relevant part, "I am going to place this order in effect until [appellant's] 19th birthday; however, I hope that it's sooner than the 19th birthday that maybe the parties will agree that this is not necessary, but if it is necessary, it's going to be in place until that point." (Tr. 141-142.)

{¶ 85} R.C. 2151.34(E)(2)(a) provides that "[a]ny protection order issued pursuant to this section shall be valid until a date certain *but not later than the date the respondent attains nineteen years of age*." (Emphasis added.) Accordingly, the duration of the trial court's protection order was explicitly authorized by the statute.

{¶ 86} Nevertheless, we find no basis upon which to conclude that the trial court's decision to order the protection order to remain in effect until June 6, 2027 was unreasonable, arbitrary, or unconscionable. As noted above, Sa.W. and appellant live next door to one another. They attend the same school and they are in the same grade. The trial court heard testimony that Sa.W. is scared to go to school based on appellant's actions. (Tr. 77.) Furthermore, both Sa.W. and D.W. testified that appellant's actions have affected Sa.W.'s ability to focus at school and her performance on tests.

{¶ 87} For all of these reasons, the trial court did not abuse its discretion in ordering the protection order to remain effective until June 6, 2027. The duration set by the trial court will ensure that appellant does not impede Sa.W.'s educational experience or performance in school. As appellant acknowledges, he will be 19 years old when the protection order expires, and appellant and Sa.W. will presumably be out of high school and moving on with their lives. Appellant's sixth assignment of error is overruled.

{¶ 88} Finally, we note that the trial court retains discretion to revisit and even modify the protection order prior to its expiration in 2027. In fact, the record reflects that the magistrate encouraged the parties to revisit and resolve the issue prior to the expiration of the protection order: "I am going to place this order in effect until [appellant's] 19th birthday; however, I hope that it's sooner than the 19th birthday that maybe the parties will agree that this is not necessary, but if it is necessary, it's going to be in place until that point." (Tr. 141-142.)

{¶ 89} Accordingly, in the event that the parties resolve the issue without the trial court's assistance, or appellant complies with the terms of the protection order for a sufficient period of time, either party can file a motion to modify the protection order.

### III. Conclusion

{¶ 90} After thoroughly reviewing the record, we affirm the trial court's judgment granting the protection order. The trial court's determinations that (1) appellant committed the offense of menacing by stalking, and (2) Sa.W. was in

danger of physical harm or mental distress if the protection order was not granted are supported by competent, credible evidence in the record. The trial court did not abuse its discretion in including D.W., L.W., and St.W. as protected parties, or ordering the protection order to remain in effect until June 6, 2027.

{¶ 91} Although we affirm the trial court's judgment, we are compelled to express our concern that this case represents, for whatever reason, the inability of parents to supervise children, and intervene in these types of situations to resolve issues without involving the government and legal system. We are equally concerned that these types of cases could set a dangerous precedent for resorting to litigation, involvement of courts and government, and protection orders to resolve interfamily disputes involving children — particularly in light of the litigious society that we live in.

{¶ 92} As this court noted in *In re E.P.*, 8th Dist. Cuyahoga No. 96602, 2011-Ohio-5829, the potential ramifications of issuing protection orders to address fights between classmates would be "far reaching." *Id.* at ¶ 45. For instance, a protection order may hinder the educational and employment opportunities that are available to a juvenile in the future. It is our hope that in the future, the type of conduct and issues involved in this case can be managed and resolved in a manner free of government intrusion.

{¶ 93} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., JUDGE

SEAN C. GALLAGHER, P.J., and
RAYMOND C. HEADEN, J., CONCUR